IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ERIC FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | JURY TRIAL REQUESTED |
| | ) | |
| v. | ) | |
| | ) No. | |
| THE BI-STATE DEVELOPMENT | ) | |
| AGENCY OF THE MISSOURI-ILLINOIS | ) | |
| METROPOLITAN DISTRICT d/b/a | ) | |
| "METRO", | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Eric Fields, by and through his undersigned attorneys, for his Complaint against The Bi-State Development Agency of the Missouri-Illinois Metropolitan District d/b/a "Metro" (herein "Metro") states:

### Count I - Facts Common to Both Counts

1. The United States of America ("U.S.") funds public transit through the Department of Transportation ("DOT"), Federal Transit Administration ("FTA"), which grants federal funds to states and localities.

2. Defendant, the Bi-State Development Agency of the Missouri-Illinois Metropolitan District, d/b/a "Metro" ("Metro"), is a legally constituted body corporate and politic created and existing by reason of a joint compact between the States of Missouri and Illinois, which is codified at Sections 70.370 *et seq.* of the Missouri Revised Statutes, as amended, and 45 ILCS 100/1 *et seq.* of the Illinois Compiled Statutes, as amended.

3. Defendant Metro is the operator of the public transportation system and recipient of federal funds with a principle place of business in St. Louis, MO.

4. Defendant Metro is designated as a local government by the United States Department of Transportation Federal Transit Administration.

## Count II – Defendant Metro Discharged Plaintiff Fields in Retaliation for Filing and in Furtherance of Actions to File a False Claims Act Complaint.

1. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(h)(2). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

2. This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

3. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) The Defendants reside in this district; (ii) Defendants transact business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) Defendants committed acts proscribed by 31 U.S.C. § 3730—acts giving rise to this action—within this district.

4. This action is timely as it has been filed within 3 years of the date of the retaliatory act, which occurred on November 20, 2012, in accordance with 31 U.S.C. §3730(h)(3).

5. Plaintiff was an employee of the Defendant from October 2003 through November 2012.

6. Plaintiff received performance review ratings that ranged between "Results Far Above Expectations" to "Results Meet Expectations" on previous 2 yearly ratings

prior to his discharge. Plaintiff's Average employee rating was "Results Above Expectations".

7. Plaintiff was assigned high profile and complex infrastructure assignments, such as the project management and closeout of the Cross County Metrolink Extension, the rehabilitation of the Eads Bridge, and the management of Metro's bridges, tunnels, culvert, and other parts of the Metrolink alignment. Plaintiff was tasked to do public presentations.

8. Plaintiff investigated False Certifications of Compliance and filed a False Claims Act Case 4:11-cv-01796-RWS in the United States District Court of Eastern Missouri, which was unsealed on or about April 20, 2012 and became known to Defendant Metro via numerous media reports. The False Claims that were filed related to:

    a. Defendant's False Certifications of Compliance that its procurements were compliant with Federal Law;

    b. That Defendant complied with the Federal Hatch Act which restricts political activities and fundraising by Defendant while receiving Federal Funds;

    c. That Defendant complied with the Uniform Relocation Act when Metro bought the Meridien Garage without an appraisal and while the developer was in default.

9. Plaintiff was investigating further acts of Defendant's False Claims liability in Fall 2012, which were disclosed to Defendant Metro's General Counsel and Senior Executives on or about October 3, 2012 via an email which stated "False Claims", with regard to achieving Federal Disadvantaged Business Enterprise contracting goals on the Eads Bridge Rehabilitation contract.

10. Plaintiff was investigating Metro's influence over the award of a DBE sub-contract to a contractor who was disqualified from the Federal DBE program for exceeding the Personal Net Worth and Revenue limits to be considered a "Disadvantaged" business.

11. Plaintiff was discharged in retaliation for these actions by Defendant Metro on November 20, 2012. Plaintiff was discharged for "failing to support Agency's DBE program" according to Defendant Sr. V.P. of Engineering, Chris Poehler.

12. November 20, 2012 was only about 7 months since Defendant Metro learned about the False Claims Act case on or about May 2012 and November 16th, 2012 was the 1st Board Meeting after the notification to General Counsel regarding the Eads Bridge DBE Compliance.

13. Defendant Metro failed to activate its Board Policy regarding compliance and fraud disclosure procedures regarding Plaintiff's disclosures.

14. Defendant Metro failed to follow its Board Policy with regards to termination.

15. Plaintiff's disclosures were contributing factors in Plaintiff's discharge.

16. Defendant Metro's Board and CEO were aware of the disclosures.

17. Defendant Metro proposed to Plaintiff an outgoing severance package, all of the terms of which the parties agreed, except that Plaintiff had to specifically release any False Claims Act claims that could be brought. Plaintiff declined the severance.

18. Plaintiff prays judgment against Metro for any and all relief available under the False Claims Act including reinstatement with the same seniority status that employee, would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## Count III – Defendant Metro Discharged Plaintiff in Retaliation for Protected Disclosures under ARRA

1. This action arises under Section 1553 of the American Recovery and Reinvestment Act of 2009, hereinafter "ARRA", Pub. L. No. 111-5, 123 Stat. 115, 516.

2. This Court has jurisdiction over this case pursuant to ARRA section § 1553 (c) (3), 123 Stat. 300.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) because: (i) The Defendant resides in this district; (ii) Defendant transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) Defendant committed retaliatory acts proscribed by ARRA —acts giving rise to this action— within this district.

4. This issue is ripe for judicial determination pursuant to ARRA section § 1553 (c) (3) as a timely complaint was filed to the inspector general on January 11, 2013 regarding the retaliatory discharge of November 20, 2012 and the head of the agency has not issued an order within the prescribed time limits.

5. Plaintiff requests a jury trial.

6. Defendant has been and continues to be a recipient of covered funds through ARRA as that term is defined.

7. Defendant is defined as a Non-Federal Employer as that term is defined under ARRA.

8. Plaintiff was an employee of the defendant, as that term is defined by ARRA, from October 2003 through November 2012 and was assigned to projects receiving ARRA

assistance, including the Meridian Garage acquisition and the Eads Bridge Rehabilitation.

9. Plaintiff made disclosure of information that plaintiff reasonably believed was evidence of:

   a. gross mismanagement of an agency contract or grant relating to covered funds;

   b. a gross waste of covered funds;

   c. an abuse of authority related to the implementation or use of covered funds; or

   d. a violation of law, rule, or regulation related to an agency contract (including the competition for or negotiation of a contract) or grant, awarded or issued relating to covered funds.

**Meridian Garage and Hatch Act Violations**

10. Plaintiff made disclosure, as defined in paragraph 9 above, of the acquisition of the Meridian Garage when Case 4:11-cv-01796-RWS was filed in the United States District Court of Eastern Missouri, which was unsealed on or about April 20, 2012 and became known to Defendant Metro.

11. Defendant Metro was the recipient of ARRA funds for Operating Assistance in 2009 and 2010. Defendant Metro uses the Meridian Garage as part of its transit operations.

12. While Defendant Metro was receiving ARRA funds, Defendant Metro certified compliance with the Federal Transit Administration's Certifications and Assurances which required compliance with

a. the Uniform Relocation Act, 42 U.S.C. 4601 et seq., including 42 U.S.C. 4651 and 4652

b. the Hatch Act, 5 U.S.C. 1501 through 1508 and 7324 through 7326 as detailed in Plaintiff filed Case 4:11-cv-01796-RWS.

13. Defendant Metro violated the certification relating to 42 U.S.C. 4651 and Defendant Metro's own Board Policy, when Defendant Metro knowingly and fraudulently avoided getting an appraisal of the Meridian Garage in order to give a politically connected developer a windfall of $5.9 Million for a valueless transaction:

   a. when the garage at issue was noticed for a 3rd year tax sale auction and Defendant Metro could have acquired the garage for back taxes if it were truly a strategic acquisition.

   b. as Defendant Metro had no need to acquire the remainder of the garage as it was a grossly underutilized facility where even on peak days it would only fill up to ½ capacity and Defendant Metro had many other critical system needs.

   c. and, the developer was being sued on a personal guarantee at the time he approached Defendant Metro to buy the remainder of the Meridian Garage.

   d. and Metro instead routed this transaction through the St. Louis County Executive, Charlie Dooley, rather than follow Defendant Metro's own policies and protecting taxpayers.

14. Defendant Metro falsely labeled this as a real estate transaction, when in fact, it was a bailout of a politically connected developer to St. Louis County Executive Charlie Dooley.

15. Defendant Metro did not publicly announce, publish on its blog, or promote this very large transaction via a press release in an effort to keep the transaction quiet and prevent disclosure of its true nature – a bailout of a politically connected developer.

16. Defendant Metro violated the Hatch Act, 5 U.S.C. 1501 through 1508 and 7324 through 7326 when Defendant Metro CEO, Bob Baer, and Defendant Metro Senior executives were fundraising for St. Louis County Executive Charlie Dooley and a transportation sales tax, while receiving Federal Funds, including ARRA funds, as detailed in Plaintiff filed Case 4:11-cv-01796-RWS, by using their influence over the award of contracts funded by federal funds.

**Eads Bridge Rehabilitation**

17. Plaintiff made disclosure as defined in paragraph 9 above in relation to the first procurement of the Eads Bridge Rehabilitation when Case: 4:11-cv-01796-RWS was filed in the United States District Court of Eastern Missouri, which was unsealed on or about April 20, 2012 and became known to Defendant Metro.

18. The Eads Bridge Rehabilitation was funded by an ARRA grant of approximately $25 Million.

19. Defendant Metro developed a project to replace the Eads Bridge Main Spans structural steel floor system, perform steel repairs, and paint. After receiving 3 bids, Defendant Metro threw out all bids that Defendant Metro deemed responsive and responsible solely because the low bidder was a non-union contractor and from out of town violating 49 CFR 18.36 (d) (2) (ii) (E).

20. Defendant Metro violated State Open Records Law, the Sunshine Act, by having an illegal closed door executive session meeting on January 28, 2011, to throw out the

Eads Bridge bids, where no exceptions would allow this matter of public business to be concealed from the public.

21. Defendant Metro informed the Federal Transit Administration that the bids were thrown out for being over budget, when, in fact, Defendant Metro's final consultant estimate for the work was actually slightly higher than the low bid and Defendant Metro had already identified funding for the low bid. Defendant Metro was also simultaneously preparing for a re-bid with less work and a much higher price, costing taxpayers millions of dollars.

22. The low bidder that was not awarded the contract was deemed responsive and responsible and compliant with the Disadvantaged Business Enterprise (DBE) goal for the project.

23. Plaintiff was investigating further acts of Defendant's False Claims liability regarding the ARRA funded Eads Bridge Project after the 2nd Bidding in Fall 2012, which were disclosed to Defendant Metro's General Counsel and Senior Executives on or about October 3, 2012 via an email which stated "False Claims", with regard to achieving Federal Disadvantaged Business Enterprise contracting goals on the Eads Bridge Rehabilitation contract.

24. Plaintiff was investigating Metro's influence over the award of a DBE sub-contract to a contractor who was disqualified from the Federal DBE program for exceeding the Personal Net Worth and Revenue limits to be considered a "Disadvantaged" business.

25. Plaintiff was subsequently discharged on November 20, 2012, the Tuesday following a quarterly Defendant Metro Board Meeting on November 16, 2012.

Case: 4:15-cv-01707-CDP Doc. #: 1 Filed: 11/13/15 Page: 10 of 11 PageID #: 10

26. Defendant Metro Senior V.P. of Engineering stated at the November 20, 2012 discharge meeting that Plaintiff was being discharged for "failure to support the Agency's DBE Program".

27. November 20, 2012 was only about 7 months since Defendant Metro learned about the False Claims Act case on or about May 2012 and November 16th, 2012 was the 1st Board Meeting after the notification to General Counsel regarding the Eads Bridge DBE Compliance.

28. Defendant Metro failed to activate its Board Policy regarding compliance and fraud disclosure procedures regarding Plaintiff's disclosures to General Counsel.

29. Defendant Metro failed to follow its Board Policy with regards to termination.

30. Plaintiff received ratings that ranged between "Results Far Above Expectations" to "Results Meet Expectations" on previous 2 yearly ratings prior to his discharge. Plaintiff's Average employee rating was "Results Above Expectations".

31. Plaintiff was assigned high profile and complex infrastructure assignments, such as the project management and closeout of the Cross County Metrolink, the rehabilitation of the Eads Bridge, and the management of Defendant Metro's bridges, tunnels, culvert, and other parts of the Metrolink alignment. Plaintiff was tasked to do public presentations.

32. Plaintiff's disclosures were contributing factors in Plaintiff's discharge.

33. Defendant Metro's Board and CEO were well aware of the disclosures.

34. Defendant Metro proposed to Plaintiff an outgoing severance package, all of the terms of which the parties agreed, except that Plaintiff had to specifically release any False Claims Act claims that could be brought. Plaintiff declined the severance.

WHEREFORE, Plaintiff prays judgment against The Bi-State Development Agency for any and all relief available under ARRA, including reinstatement with back pay, compensatory damages, employment benefits, all costs and expenses, including attorneys' fees and expert witnesses' fees, in the amount of $500,000.00.

/s/Ronald A. Roth
Ronald A. Roth #51637 MO
Roth Law Offices, LLC
2421 Corporate Centre Dr., Ste. 200
Granite City, IL 62040
#618/931-5000
raroth@rothlaw.com
Attorney for Plaintiff


/s/Christopher B. Hunter
Christopher B. Hunter #26969 MO
Hunter & Johnson, P.C.
5213 Mae Drive, Suite B
Godfrey, IL 62035
chunter@hunterjohnsonlaw.com
Attorney for Plaintiff